679 So.2d 372 (1996)
Odelia Leger SMITH, et al.,
v.
AUDUBON INSURANCE COMPANY.
No. 95-C-2057.
Supreme Court of Louisiana.
September 5, 1996.
Rehearing Denied October 4, 1996.
*373 Kraig T. Strenge, Lafayette, for Applicant.
John H. Weinstein, Opelousas, Hamilton J. Chauvin, Jr., Metairie, and Aaron F. McGee, for Respondent.
LEMMON, Justice.[*]
This is an action by an insured against his homeowner's insurer for damages sustained when a judgment in excess of the policy limits was rendered against the insured in an earlier tort action.[1] In this action, the insured claims that the insurer is liable for the excess judgment, as well as for penalties and attorney's fees, because of its bad faith failure to settle the claim within the policy limits. The principal issue in this court is whether the trial court committed manifest error in rejecting the insured's claim.

Facts
The insured owned a mobile home covered by a homeowner's policy issued by defendant insurer with liability limits of $25,000. On May 12, 1987, the insured's twenty-nine-year-old grandson, Kenneth Smith, was attempting to install a rebuilt gasoline motor onto his grandfather's riding lawn mower at his grandfather's home. Kenneth had rebuilt the motor from two old motors given to him by his employer, but had not yet tested the rebuilt motor.
Kenneth Smith removed the old motor from the mower and connected the rebuilt motor to the gas tank with a short hose, but did not bolt down the motor. Kenneth pulled the cord for the manual starter, whereupon the motor caught fire at the carburetor. Kenneth attempted to put out the fire with his shirt, but then grabbed a burlap sack in the workshop and "hit" the fire with the sack. At that point, the fire flamed up, badly burning Kenneth and slightly burning his grandfather.
The grandfather immediately notified his insurer of the accident. An independent claims adjuster took statements from the insured and his grandson shortly after the injury. In his recorded statement given three days after the accident, Kenneth Smith stated "[w]hen I pulled it again, the carburetor caught on fire and it wasn't bolted down or nothing and I went and got the sack to put the fire out, I guess I knocked the tank and everything off and that is when the gas flew up on me."[2] Since the statement indicated that the insured did not rebuild the engine or put the rebuilt engine on the mower and did not direct his grandson's activities, and since neither statement suggested any negligence on the part of the insured, the adjuster filed the following report:
It appears claimant caused his injury. He put an untested old motor (age unknown) onto an old mower. The motor was not bolted down. Claimant owned the motor he was putting on. The insured in no way assisted in repair of mower.
*374 Kenneth Smith requested his grandfather's insurer to pay all of his medical bills and his lost wages.[3] The insurer paid $2,000 under the medical payment feature of the policy, but declined to pay anything further. The underlying tort action ensued.

Underlying Tort Action
In his petition filed in January 1988 in the underlying case, Kenneth Smith alleged that he "was assisting [his grandfather] in the repair of a rider lawn mower" when the carburetor caught on fire. This allegation contrasted with the grandfather's statement that, referring to his grandson, "he had to tune it [the rebuilt motor] up" and "he was putting a new motor in at the time of the accident," and with Kenneth's own statement that "I put the motor together and ... I had the motor on the lawn mower but I didn't have it bolted down and I went to start it and it popped like it was going to start and then when I went to start it again, it caught on fire...." Moreover, in answer to the question whether his grandfather was directing his "putting this motor on the lawn mower" or "telling you how to do it," Kenneth had stated "[n]o I knew how to do it."
The petition further alleged that while Kenneth Smith "was attempting to put the small fire out with a burlap sack, [his grandfather] negligently and carelessly dropped the lawn mower gas tank" and "[t]he gasoline in the tank splashed out and on to" Kenneth. However, neither Kenneth nor his grandfather in their recorded statements had ever mentioned the grandfather's holding the gas tank or dropping it onto the fire. Indeed, as noted above, Kenneth had volunteered that probably he had "knocked the tank and everything off and that is when the gas flew up on me."
Pretrial depositions by Kenneth Smith and his grandfather, the only two witnesses to the accident, presented versions much more favorable to Kenneth's recovery against his grandfather's insurer than their original statements. Kenneth testified that "I got a feed sack, when I hitwhen I hit the carburetor to put the fire out, either he [the grandfather] dropped the tank or I knocked it out of his hand, I don't know which ..." (emphasis added). In his deposition,[4] the grandfather testified that while Kenneth was attempting to douse the carburetor fire with a burlap sack, the grandfather's hands and shirt caught on fire, and he either dropped the tank or threw it away from him, splashing gasoline onto Kenneth.
Prior to trial, Kenneth Smith's attorney offered several times to settle the case for the policy limits of $25,000, but the insurer declined the offer. Throughout the pretrial preparation, the insurer's attorney continued to advise that the claim was defensible, even though Kenneth and his grandfather had flavored their earlier statements with more favorable subsequent versions.
At trial, the grandfather was unable to testify because of a terminal illness.
Kenneth Smith testified at trial that after he placed the unbolted motor on the mower chassis with the motor connected to the gas tank, he looked for a place to bolt the tank to the chassis, but his grandfather instructed him to proceed with his attempt to start the motor while the grandfather held the tank in his hands. He (Kenneth) filled the tank with gasoline and attempted unsuccessfully to start the motor, removed the top and adjusted the points, and then pulled the cord again. On the second pull, the motor backfired, and the carburetor caught on fire. He and his grandfather remained calm, according to Kenneth's testimony (although the grandfather was holding the fuel tank connected by hose to the burning engine), because the fire was small. He then "placed" the burlap sack over the fire which suddenly grew larger. Kenneth asserted, in contrast to earlier deposition testimony, that he "now knew" he did not knock the fuel tank out of his grandfather's hands.
On cross-examination, Kenneth Smith admitted his previous statements were not that he had "placed" the burlap sack over the fire, *375 but rather that he had "hit" the carburetor with the sack. He also admitted previous testimony that he did not know how the fuel tank left his grandfather's hands and that he had stated either he knocked the tank from his grandfather's hands or his grandfather dropped the tank onto the burning carburetor.
The jury allocated forty percent of the fault in the case to Kenneth Smith and sixty percent to his grandfather. The judgment, in accordance with the fault allocation and the amount of damages found by the jury, awarded Kenneth a judgment of $25,000 in principal against his grandfather and the insurer, and an excess judgment of $30,363.62 in principal against his grandfather.
The insurer's attorney notified the insured of his right to appeal through the insurer's attorneys, but stated that the insurer would not appeal its portion of the judgment. The insurer's attorney also discussed with Kenneth Smith's attorney the possibility of post-judgment settlement for the policy limits, but Kenneth's attorney made no such offer.[5]

Present Action Against Insurer for Excess Judgment
After the insured died, his widow, as executrix of his estate, filed the instant action. Asserting that it was apparent in the underlying tort action "that a submissible case of negligence would be made for the jury on non-disputed evidence," the executrix alleged that her husband's insurer "was negligent and guilty of bad faith in refusing to accept the compromise offer" to settle within the policy limits (emphasis added). The petition sought damages in the amount of the excess judgment, along with penalties and attorney's fees.
After trial on the merits, the trial court rejected all claims and dismissed the action.[6] The judge concluded that "from the information available, especially but not exclusively, the deposition of plaintiff in the prior case, the insurer was justified in defending the matter and was not arbitrary, capricious or otherwise guilty of conduct making it liable for the excess judgment." Upon request for more specific findings, the trial judge observed that neither of the two witnesses to the accident, Kenneth Smith nor his grandfather, made any mention of any negligence on the grandfather's part in recorded interviews taken within six days of the accident. The judge further noted that neither witness had mentioned in the initial statement that the grandfather held the gas tank or that the tank was disengaged from the motor for any reason. Referring to Kenneth's recorded interview, the judge emphasized that the claimant at one point stated "gasoline flew all over him when he struck the carburetor with the burlap sack and the motor toppled over" and at another point "guessed he knocked the tank and everything off." Finally, the judge noted Kenneth's admission in his deposition that he really didn't know what had happened, but "attempted to favor a version that the grandfather had dropped the tank." Based on this evidence, the judge concluded that the insurer was justified in defending the case.
On appeal of the executrix, the intermediate court reversed. 94-1571 (La.App. 3 Cir. 5/3/95); 656 So.2d 11. In reciting the facts, the court stated that the grandfather "either dropped the tank or threw it on Kenneth."[7]Id. at 13. The court noted offers to settle, first for the medical expenses and later for the policy limits, and the fact that the insurer knew its insured would not be able to attend trial. In discussing manifest error, the court stated:
[W]e find that it was not reasonable for the trial court to rely on the defendant's representations that there was no liability on the part of its insured. Audubon clearly was aware of the fact that both Cleven Smith and Kenneth Smith had some part in *376 causing the accident. They did not have a reasonable belief that Kenneth Smith was 100% at fault. Thus, Audubon's actions in failing to make settlement offers when its insured was potentially exposed to a large excess judgment were also unreasonable.... We find the trial court committed manifest error in failing to find that the insurer acted in bad faith.
Id. at 17 (emphasis added). The court accordingly awarded the executrix the amount of the excess judgment, in addition to penalties and attorney's fees.
On the insurer's application, we granted certiorari because the record evidence appeared to furnish adequate support for the factual findings of the trial court and because there appeared to be no basis in the statutes or in the decisions of this court for the award of either penalties or attorney's fees. 95-2057 (La.11/17/95); 663 So.2d 724.

Insurer's Liability for Excess Judgment
In the absence of bad faith, a liability insurer generally is free to settle or to litigate at its own discretion, without liability to its insured for a judgment in excess of the policy limits. William Shelby McKenzie & H. Alston Johnson, III, 15 Louisiana Civil Law Treatise-Insurance Law and Practice § 218 (1986). On the other hand, a liability insurer is the representative of the interests of its insured, and the insurer, when handling claims, must carefully consider not only its own self-interest, but also its insured's interest so as to protect the insured from exposure to excess liability. Holtzclaw v. Falco, Inc., 355 So.2d 1279 (La.1978) (on rehearing). Thus, a liability insurer owes its insured the duty to act in good faith and to deal fairly in handling claims. Id.
This court, while recognizing in Roberie v. Southern Farm Bureau Casualty Ins. Co., 250 La. 105, 194 So.2d 713 (1967) the responsibility of a liability insurer to deal in good faith with a claim against its insured,[8] has never held a liability insurer liable for an excess judgment rendered against the insured. Nevertheless, the intermediate state courts and the federal courts have held liability insurers liable for an excess judgment when the insurer failed to deal in good faith with a claim against its insured. See, e.g., Domangue v. Henry, 394 So.2d 638 (La.App. 1st Cir.1980), cert. denied, 399 So.2d 602 (La.1981) (after a tentative agreement to a settlement for the $10,000 liability policy limits, the compromise fell through when the insurer sought further negotiation of the victim's demand for $600 for automobile depreciation under the property damage coverage; the court held the insurer liable for the excess judgment of $23,000 over the policy limits, noting that the excess exposure, in a case with a "great preponderance of evidence" of the insured's fault, hinged on a dispute of less than $600);[9]Fertitta v. Allstate Ins. Co., 439 So.2d 531 (La.App. 1st Cir.1983), amended on other grounds and aff'd., 462 So.2d 159 (La.1985) (in a case of clear liability with about $8,000 in special damages and $10,000 policy limits, the insurer was liable for an excess judgment of almost $39,000 because of bad faith in failing to investigate the claim thoroughly, in failing to consider properly the extent of the insured's excess exposure, and in requiring that the settlement include a $2,668 medical payments subrogation claim by the tort victim's insurer); Hodge v. American Fidelity Fire Ins. Co., 486 So.2d 233 (La.App. 3d Cir.), cert. denied, 489 So.2d 917 (La.1986) (the insurer was in bad faith and liable for an excess judgment of $40,000 for failing to tender its $10,000 policy limits when an adverse judgment was inevitable and the insurer grossly disregarded its insured's interests despite repeated warnings from its attorney); Keith v. Comco Ins. Co., 574 So.2d 1270 (La.App. 2d Cir.), cert. denied, 577 So.2d 16 (La.1991) (the court held the insurer in bad *377 faith in a case of clear liability when the insurer arbitrarily refused to accept the treating physician's findings and rejected reasonable offers that would have totally protected the insured); Roy v. Glaude, 494 So.2d 1243 (La.App. 3d Cir.1986) (insurer was liable for excess judgment for arbitrarily refusing to settle within policy limits). See also Parich v. State Farm Mut. Auto. Ins. Co., 919 F.2d 906 (5th Cir.1990), cert. denied, 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991) (the insurer was in bad faith by arbitrarily refusing to pay interest in addition to the policy limits when the judgment clearly would exceed the policy limits).
Thus, the determination of whether the insurer acted in bad faith turns on the facts and circumstances of each case. Of course, an insurer is not obliged to compromise litigation just because the claimant offers to settle a claim for serious injuries within the policy limits, and its failure to do so is not by itself proof of bad faith. The determination of good or bad faith in an insurer's deciding to proceed to trial involves the weighing of such factors, among others, as the probability of the insured's liability, the extent of the damages incurred by the claimant, the amount of the policy limits, the adequacy of the insurer's investigation, and the openness of communications between the insurer and the insured.[10] Nevertheless, when an insurer has made a thorough investigation and the evidence developed in the investigation is such that reasonable minds could differ over the liability of the insured, the insurer has the right to choose to litigate the claim, unless other factors, such as a vast difference between the policy limits and the insured's total exposure, dictate a decision to settle the claim.

Application to the Present Case
Because the determination of a liability insurer's bad faith failure to settle in excess judgment cases is so fact-intensive, great deference must be accorded to the trier of fact. This was the primary error of the court of appeal in the instant case.
Here, the insurer not only had a statement from its insured six days after the accident that did not suggest any negligence on his part, but also had a statement from the claimant three days after the accident that suggested the claimant was entirely at fault. These statements were recorded at an unsuspicious time when the witnesses likely did not know the significance of the claimant's establishing negligence on the part of the grandfather in order to succeed with the claim. Moreover, there was a close family relationship between the claimant and the insured, a relationship that became more significant as the witnesses' versions of the incident shifted with time toward negligent behavior by the insured.
The trial judge considered all of these factors, supported by the record, and decided that the insurer was entitled to its day in court without penalty for bad faith failure to settle. Since reasonable minds could have differed, based on the evidence developed in a thorough investigation, on the liability of the insured in the underlying tort case, the trial court concluded the insurer was not arbitrary or capricious under the overall circumstances in refusing to settle within the policy limits.
The court of appeal clearly substituted its judgment for that of the trial court, failing to accord any deference to the trial court's supported fact findings. Beginning with the factual recitation that the insured either dropped the tank on the burning carburetor or threw the tank away from himself onto the small fire, the intermediate court ignored the weight given by the trial court (1) to the witnesses' statements, given at an unsuspicious time, which tended to exonerate the insured and to inculpate the claimant, and (2) *378 to the claimant's deposition which established that he did not know whether he knocked the gas tank over with the sack or the grandfather dropped or threw the tank away from him. Based on these faulty factual and legal premises, the intermediate court concluded that the insurer clearly was aware that both Kenneth Smith and his grandfather contributed equally to the accident. The trial judge reached the contrary conclusion on the disputed evidence, believing that defendant had sufficient basis, from the paucity of evidence of the insured's fault, to justify refusing to pay the policy limits to compromise the very questionable claim. The appellate court erred in reversing this primarily factual determination.
Accordingly, the judgment of the court of appeal is set aside, and the judgment of the trial court dismissing the action is reinstated.
WATSON, J., concurs in the result.
CALOGERO, C.J., dissents and assigns reasons.
JOHNSON, J., dissents.
CALOGERO, Chief Justice, dissenting.
Our principal reason for granting certiorari in this matter was the likelihood that the court of appeal erred in casting defendant for penalties and attorney's fees premised upon a supposed violation of La. R.S. 22:658. Since the majority permissibly looks beyond that issue to reject the plaintiff entirely, the issue of the availability of attorney's fees and penalties under La. R.S. 22:658 is of no moment to the majority and hence appropriately merits no discussion in the majority opinion. As to the chief holding, I disagree with the majority's complete rejection of the plaintiff. I would instead affirm, but give the insurer relief as to the penalties and attorney's fees assessed in the court of appeal.
On the chief finding, Audubon first refused to settle the claim for $14,665.20 in medical expenses, then later refused to settle for the $25,000 policy limits on a claim clearly worth much more, should liability be established. Audubon argues it had legitimate reason to believe that its insured had no liability based solely on one equivocal statement from the claimant Kenneth Smith, a statement made while claimant Smith was on medication the morning after the accident. But things turned worse for the defendants as trial neared: subsequent depositions from both the insured and the claimant conflicted with the claimant's earlier statement, and the insured became too ill to testify at trial, leaving only the badly burned and obviously sympathetic claimant to testify to the jury. It surely must have become apparent to it that its insured was substantially at risk of being cast in judgment for a sum in excess of the $25,000 policy limit.
At this point, Audubon should have accepted plaintiff's repeated offer to settle within the fairly moderate policy limits. Yet it refused, without informing its insureds of the plaintiff's four offers of settlement, and without sending its insureds an excess letter informing them that they would be liable for any excess judgment. These factors, together with the potential extent of any excess judgment, weighed in favor of a finding that Audubon violated its fundamental obligation to protect the interests of its insured. Audubon should not have risked its insured's money in a case this close. Through its neglect to settle, its insured was put on the hook for an excess judgment of over $30,000 (as it turned out). The record contains ample evidence to support holding Audubon liable for that excess; the majority, in my opinion, errs in reversing that portion of the court of appeal's opinion.
Were my view to have prevailed, it would have been incumbent upon the Court to address the chief issue behind our granting the writ, which is whether attorney's fees are available to a plaintiff who has successfully shown that his insurer in bad faith failed to settle a claim against its insured. My views on this are as follows.
As a general proposition, attorney's fees are not allowed against an unsuccessful litigant. They may only be awarded when there is a provision for same in contract or by statute. See Killebrew v. Abbott Laboratories, 359 So.2d 1275, 1278 (La.1978); Beier Radio, Inc. v. Black Gold Marine, Inc., 449 So.2d 1014, 1015 (La.1984); Huddleston v. Bossier Bank and Trust Company, 475 So.2d *379 1082, 1085 (La.1985). These same principles are applicable to unsuccessful litigants in litigation involving insurance companies.
There are statutes, however, which allow attorney's fees and/or penalties against insurance companies for proscribed conduct. For instance, La. R.S. 22:657, dealing with payments due on health and accident policies, recites that the failure of an insurer to pay a claim on a health or accident policy within thirty days will subject the insurer to a penalty of double the amount of benefits due, plus attorney's fees. Also, La. R.S. 22:656, regarding life insurance policies and death claims, allows for a penalty in the form of interest if the insurer fails to settle without just cause within sixty days after the date of receipt of proof of loss. These statutes share "a common purpose of imposing some sort of penalty upon an insurer who arbitrarily and capriciously fails to pay a claim [due to an insured or her designee] within the delay specified in each instance." Reichert v. Continental Insurance Company, 290 So.2d 730, 735 (La.App. 1st Cir.1974).
The legislature at La. R.S. 22:658 has also made provision for penalties and attorney's fees regarding all insurance policies other than life, health and accident and Worker's Compensation.[1] That statute provides for an assessment of penalties and/or attorney's fees against an insurer, in two instances: (1) if an insurer fails to pay a claim "within thirty days after receipt of satisfactory proof of loss from the insured" (R.S. 22:658(A)(1))[2] or (2) if an insurer fails to pay the amount of any third party claim and any reasonable medical expense claim due a bona fide third party claimant within 30 days "after written agreement of settlement of the claim from an third party claimant" (R.S. 22:658(A)(2)).[3] If an insurer's action falls into either one of these two categories, then that insurer is subject to the provisions of La. R.S. 22:658(B)(1), regarding penalties and attorney's fees. That statute states that:
B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor, as provided in R.S. 22:658(A)(1), or within thirty days after written agreement or settlement as provided in R.S. 22:658(A)(2) when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of ten percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, together with all reasonable attorney fees for the prosecution and collection of such loss, or in the event a partial payment or tender has been made, ten percent of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney fees for the prosecution and collection of such amount. (emphasis added).
The case before us, however, is distinguishable from the situations recited in R.S. 22:658(B)(1). Here we have an insurer who negligently and in bad faith refused to settle a claim and protect its insured, as contractually required, from the risk of an excess judgment. That conduct is not governed by La. R.S. 22:658. The latter simply does not apply, for this is not an instance where an *380 insurer has refused to pay an insured within thirty days following proof or loss, nor is it a case where more than thirty days have passed without payment following a written settlement with a third party claimant.
Some recent cases out of the courts of appeal have held penalties and attorney's fees proper in cases such as this one. See Maryland Casualty Company v. Dixie Insurance Company, 622 So.2d 698 (La.App. 1st Cir.1993); Domangue, supra; Roy v. Glaude, 494 So.2d 1243 (La.App. 3d Cir. 1986); Fertitta v. Allstate Insurance Company, 439 So.2d 531 (La.App. 1st Cir.1983). None of these cases, however, cites a statutory or contractual basis supporting their award of attorney fees; nor do they cite a statutory basis supporting the imposition of penalties upon insurers for failing to settle with a third party. The cases relied upon by the court of appeal to support the award of penalties and attorney fees under La. R.S. 22:658, Maryland Casualty Company, supra; Domangue, supra; Roy and Fertitta, supra, are incorrect, in my view, insofar as they allow for the recovery of penalties and attorney fees under La. R.S. 22:658.
Plaintiff makes the additional argument that under La. R.S. 22:1220, penalties and attorney's fees are properly imposed in a case where an excess judgment is assessed against an insured as a consequence of an insurer's negligent or bad faith refusal to settle with a third party. Setting aside whether R.S. 22:1220, which imposes an affirmative duty on the insurer to make a "reasonable effort to settle claims with the insured or the claimant, or both" applies to cases such as this, I note that the statute cannot be applied to this case. The enactment of R.S. 22:1220 created a substantive change in the law that was not made effective until after the events in question occurred. The statute cannot be given retroactive effect. See Manuel v. Louisiana Sheriff's Risk Management Fund, 95-0406, p. 9 (La.11/27/95), 664 So.2d 81, 86.
It is thus my view in dissent that the Court should have let the court of appeal opinion stand in its chief holding, then reject its errant assessment of attorney's fees and penalties.
NOTES
[*] Because of the vacancy created by the resignation of Dennis, J., now a judge on the United States Court of Appeals for the Fifth Circuit, there was no justice designated "not on panel" under Rule IV, Part 2, § 3. Panel included Chief Justice Calogero and Justices Marcus, Watson, Lemmon, Kimball, Johnson and Victory.
[1] The insured, Cleven Smith, died after the tort judgment and before the filing of the present action. While the plaintiff in this action is actually the executrix of Cleven Smith's succession, the term "insured" is used in this opinion for simplicity.
[2] Earlier in the recorded statement, Kenneth stated "I went in there and got a sack and hit the [inaudible] of the sack and I guess the motor toppled over in it and gasoline flew all over me."
[3] The medical expenses ultimately approached $14,000 and the lost wages for approximately six weeks were $3,300.
[4] The grandfather's deposition is not in the record, but the testimony is described in a letter in the record to the grandfather's insurer from its attorney.
[5] Had Kenneth Smith made an offer to settle for policy limits after judgment, and had the insurer rejected that offer, the result we reach certainly may have been different.
[6] The case was tried before a jury, but the judge declared a mistrial when the jury was unable to reach a verdict. The parties then stipulated that the judge would decide the case on the same evidence that had been submitted to the jury.
[7] If this fact were undisputed, the trial judge's dismissal of the excess claim possibly would have been manifestly erroneous.
[8] In Roberie, this court held that the insurer was not in bad faith in refusing to settle the claims and was not arbitrary in preferring litigation to compromise.
[9] In Ward v. State Farm Mutual Auto. Ins. Co., 539 F.2d 1044 (5th Cir.1976), similar facts led to an excess judgment of over $500,000 when the insurer in a case of undisputed liability rejected a $1,400 settlement offer, at a time shortly after the accident and before the tort victim's condition deteriorated to an incredible degree, and later rejected an offer for the $10,000 liability policy limits because the offer required payment of $500 for automobile depreciation.
[10] Several cases have addressed the issue of excess liability in the context of the insurer's duty to keep the insured informed of developments in the handling of the claim. See McKenzie & Johnson, supra, § 219. While the insurer in the present case did not keep the insured informed of the negotiations with the claimant, the failure was clearly non-prejudicial because of the close familial relationship (grandfather-grandson) between the insured and the claimant. While the insurer still had the duty to act in good faith in protecting the insured against excess exposure, no prejudice has been shown to the grandfather because the insurer failed to inform him of settlement offers or to seek his participation in offering a compromise.
[1] La. R.S. 22:658 excludes worker's compensation claims (Chapter 10 of Title 23 of La. R.S. 1950) no doubt because Chapter 10 makes its own provisions for penalties and attorney fees in such cases.
[2] La. R.S. 22:658(A)(1) provides that:

A. (1) All insurers issuing any type of contract, other than those specified in R.S. 22:656, R.S. 22:657, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest.
[3] La. R.S. 22:658(A)(2) provides that:

(2) All insurers issuing any type of contract, other than those specified in R.S. 22:656, R.S. 22:657, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any third party property damage claim and of any reasonable medical expenses claim due any bona fide third party claimant within thirty days after written agreement of settlement of the claim from any third party claimant.