844 So.2d 19 (2003)
Monica Ann LAFAUCI
v.
Randall J. JENKINS and Illinois National Insurance Company, an Affiliate of the American International Group.
No. 2001 CA 2960.
Court of Appeal of Louisiana, First Circuit.
January 15, 2003.
Writ Denied April 25, 2003.
*22 Kevin M. Wheeler, New Orleans, Counsel for Plaintiff/Appellee Monica Ann Lafauci.
Rene D. Guidry, William E. Willard, Baton Rouge, Counsel for Defendant/Appellant Illinois National Ins. Co.
John L. Tyler, Baton Rouge, Counsel for Defendant/Appellee Randall J. Jenkins.
Before: KUHN, DOWNING and GAIDRY, JJ.
GAIDRY, J.
This matter arose from a motor vehicle collision between vehicles operated by the plaintiff, Monica Ann Lafauci, and the defendant, Randall J. Jenkins. Ms. Lafauci was injured and brought suit for damages against Mr. Jenkins and his automobile liability insurer, Illinois National Insurance Company. Prior to trial, the insurer deposited its liability coverage limits and accrued legal interest in the registry of the trial court. The trial court rendered judgment in favor of Ms. Lafauci against Mr. Jenkins, and in favor of him against his insurer for the amount in excess of its liability coverage limits, as well as other amounts incurred by him in his own defense. Illinois National Insurance Company thereupon instituted this appeal.

FACTUAL AND PROCEDURAL BACKGROUND
On January 5, 2000, at approximately 10:30 p.m., Ms. Lafauci was driving her automobile in the left northbound lane of South Acadian Throughway, approaching its intersection with Perkins Road in Baton Rouge, Louisiana. At the same time, Mr. Jenkins was approaching the intersection from the opposite direction. As Ms. Lafauci crossed the intersection with a green traffic light, Mr. Jenkins initiated a left turn into her lane of travel, causing a collision.
Following the collision, Mr. Jenkins exhibited behavior and conditions suggesting that he was intoxicated. A field sobriety test was administered, but Mr. Jenkins refused to submit to a breath test to determine blood alcohol level.
Illinois National Insurance Company (Illinois National) provided automobile liability coverage to Mr. Jenkins under a policy issued to him as named insured, with applicable bodily injury liability coverage limits of $10,000.00. Prior to suit being filed, *23 it investigated the claim and entered into negotiations with Ms. Lafauci regarding her injury claim. Ms. Lafauci eventually retained counsel. After an offer to settle for the policy limits of $10,000.00 was rejected by Illinois National, suit was filed on September 25, 2000. Illinois National obtained an informal extension of time to answer the suit on its own behalf only, and filed an answer on its own behalf on November 22, 2000. On February 7, 2001, Mr. Jenkins, through his personal counsel, filed his answer to the suit, incorporating a cross-claim against Illinois National, seeking indemnity for any excess judgment rendered against him, statutory penalties, and attorney's fees. On February 28, 2001, Illinois National filed a motion seeking leave to file its policy limits and accrued legal interest into the registry of the court, and an order permitting the deposit was signed the same day.
Following a bench trial, judgment was rendered in favor of Ms. Lafauci and against Mr. Jenkins, awarding her $35,000.00 in general damages for her physical injuries, $10,000.00 in general damages for psychological injuries, $22,500.00 in exemplary damages, special damages of $3,186.90, and legal interest and costs.[1] In the same judgment, the trial court granted judgment in favor of Mr. Jenkins and against Illinois National on his cross-claim for the sum in excess of the policy limits of $10,000.00, or $60,686.90, and all costs. Although the trial court's judgment found Mr. Jenkins was also entitled to reasonable attorney's fees and legal interest thereon from date of judgment, it deferred the trial as to that issue. Judgment was subsequently rendered awarding Mr. Jenkins attorney's fees in the total amount of $8,846.25, plus additional court costs of $144.64.
From the judgment against it, as supplemented, Illinois National appeals.

ASSIGNMENTS OF ERROR
Illinois National assigns as error (1) the quantum of the awards of general and exemplary damages, (2) the finding that it breached its fiduciary duties of good faith and fair dealing to its insured and is therefore liable to him for the amounts awarded in excess of its limits, including his attorney's fees, and (3) the inclusion of the award of exemplary damages in the judgment on its insured's cross-claim.[2]

DAMAGES FOR PHYSICAL INJURIES
As the result of the collision, Ms. Lafauci sustained multiple bodily injuries, consisting of a nondisplaced fracture of the right patella, a right ankle sprain and contusion, a left hand contusion, and multiple abrasions. She went to the emergency room of Our Lady of the Lake Hospital immediately after the accident, but was not able to be treated for some time due to the number of other patients being seen. She decided to go to the emergency room of St. Tammany Parish General Hospital, and was taken there by her mother. A *24 knee immobilizer was applied to her right leg, and she was treated and released.
Ms. Lafauci subsequently consulted Dr. Charles Baier, who referred her to Dr. Kevin Darr, an orthopedic surgeon. Dr. Darr first saw her a week after the accident, and confirmed the diagnosis of a nondisplaced right patella fracture, as well as contusions of the right ankle and left hand. Dr. Darr observed that Ms, Lafauci was walking with a limp, and had "significant" complaints regarding the injured areas. He specifically noted the presence of "patella crepitance." By the next visit of February 23, 2000, Ms. Lafauci had significant improvement regarding her right knee, and x-ray examination revealed that the fracture had healed. She had "50% improvement" as to her ankle and wrist injuries. Dr. Darr last examined Ms. Lafauci on May 12, 2000, at which time she still had ankle discomfort when climbing stairs, although the other areas of injury had improved. Dr. Darr diagnosed a "right ankle sprain/synovitis," and recommended a "specific and aggressive ankle rehabilitation program."
Ms. Lafauci testified that although her ankle injury responded within one and a half months to the recommended exercise program, she still had intermittent complaints at the time of trial, and was limited in her ability to wear high-heeled shoes. Additionally, she still experienced "a little" discomfort in her right knee at the time of trial. At the time of the accident, Ms. Lafauci was a student attending Louisiana State University in Baton Rouge. Her injuries, knee immobilization, and use of crutches caused her considerable inconvenience in attending classes and negotiating the stairs to her second-floor apartment. Ms. Lafauci's testimony regarding the consequences of her injuries was corroborated by the testimony of her mother. No evidence controverting the medical records and injury testimony was presented.
The trial court awarded Ms. Lafauci the sum of $35,000.00 in general damages for her physical injuries. We conclude that the trial court did not abuse its great discretion in making this award of general damages.

DAMAGES FOR PSYCHOLOGICAL INJURIES
The trial court's judgment refers to Ms. Lafauci's claimed psychological injuries as a "post traumatic stress disorder." In its oral reasons for judgment, the court described those injuries as including a "post traumatic stress syndrome," in addition to a phobia.[3] There is no evidence whatsoever in the trial court record supporting the existence of that particular psychological condition, other than a brief mention by plaintiff regarding a hearsay comment supposedly made by Ms. Case.[4] The only competent evidence of the nature of the psychological injuries sustained by *25 plaintiff is the very terse report of the treating social worker, Ms. Case, which states only that plaintiff was treated with psychotherapy on six occasions for "simple phobia."
The trial court clearly erred in finding that plaintiff sustained a "post traumatic stress syndrome," in addition to a "simple phobia." Since the award of general damages for the element of psychological injuries was predicated upon that fundamental factual error, we may not accord it the deference due a damages award properly supported by a preponderance of the evidence. Instead, we are required to review the record and make a de novo determination of the damages due, if any. Ferrell v. Fireman's Fund Insurance Company, 94-1252, pp. 3-4 (La.2/20/95), 650 So.2d 742, 745.
Ms. Lafauci did not consult Ms. Case, a licensed social worker, until July 14, 2000. She attended six sessions of psychotherapy over a period of approximately six weeks for treatment of a condition diagnosed as "simple phobia." We conclude that an award of $2,500.00 in general damages for plaintiff's temporary phobia, which resolved within a short period of time and without any evidence of impairment, is appropriate and fair, given the facts described above. The trial court's judgment is therefore reversed in part with regard to its award of general damages for psychological injuries.

EXEMPLARY DAMAGES
Illinois National challenges the trial court's award of exemplary damages made under La. C.C. art. 2315.4, which provides:
In addition to general and special damages, exemplary damages may be awarded upon proof that the injuries on which the action is based were caused by a wanton or reckless disregard for the rights and safety of others by a defendant whose intoxication while operating a motor vehicle was a cause in fact of the resulting injuries.
The decision to award exemplary damages under La. C.C. art. 2315.4 rests within the sound discretion of the trier of fact. Khaled v. Windham, 94-2171, p. 12 (La.App. 1st Cir.6/23/95), 657 So.2d 672, 67681. The article has the dual purpose to both penalize (and thus deter) drunk drivers, and to provide damages for the victims of such drivers. Brumfield v. Guilmino, 93-0366 (La.App. 1st Cir.3/11/94), 633 So.2d 903, 912. Recovery of exemplary damages requires proof of three elements: (1) that the defendant was intoxicated or had consumed a sufficient quantity of intoxicants to make him lose normal control of his mental and physical faculties; (2) that the intoxication was a cause-in-fact of the resulting injuries; and (3) that the injuries were caused by the defendant's wanton or reckless disregard for the rights and safety of others. Minvielle v. Lewis, 610 So.2d 942, 946 (La.App. 1st Cir.1992).
Mr. Jenkins did not take the stand in his own defense on the issue of the exemplary damages claim. The uncontradicted testimony of Ms. Lafauci and the two investigating police officers, as well as the circumstantial evidence, support the trial court's determination that Mr. Jenkins was intoxicated at the time of the accident.
Ms. Lafauci testified that Mr. Jenkins had bloodshot eyes, smelled of an alcoholic beverage, and seemed unresponsive to her inquiries of him immediately after the accident. Officer Lyle Johnson, the first police officer on the scene, testified that Mr. Jenkins exhibited such obvious signs of intoxication that he felt it unnecessary to administer a field sobriety test at the time he spoke to him. A field sobriety test *26 administered later at the police district office established that Mr. Jenkins's sense of balance, his orientation, and his coordination were impaired, justifying a request that he submit to a breath test, which he declined.
The circumstances of the collision further corroborate the finding of intoxication. The weather was clear, the traffic light was functioning properly, and there were no obstructions to the view of either driver as they approached the intersection. The collision was described as a head on collision, indicating that Mr. Jenkins's turn was initiated when Ms. Lafauci's automobile was in close proximity and readily visible. Mr. Jenkins told Officer Lyle that he had a green turn arrow when the accident occurred, but that circumstance would have indicated that the light controlling Ms. Lafauci would have been red, rather than green, as she testified. The trial court obviously found Ms. Lafauci's version of the accident to be more credible.
While the evidence as to the element of wanton or reckless disregard for the safety of others was perhaps not as strong as that of other reported cases, we are convinced that, as a whole, it was sufficient to support the trial court's discretion in the award of exemplary damages. Likewise, the amount of the award, $22,500.00, while arguably generous, was much less than the amount of compensatory damages awarded. We find no abuse of discretion as to the amount of exemplary damages.

POLICY COVERAGE AND DUTY TO DEFEND
Illinois National contends that as its policy did not provide coverage for its insured's liability for exemplary damages, it cannot be cast in judgment for those damages, and owed no duty to defend him for those claimed damages. This contention is founded upon misinterpretation of its own policy, as explained below.
Mr. Jenkins was the named insured in Illinois National's policy No. AIG 9142963. In addition to its declarations page, the policy is composed of standard personal automobile policy forms published by Insurance Services Office, Inc. The basic policy agreement is "Personal Auto Policy" form PP 00 01 06 94. The policy includes two endorsement forms amending the basic policy agreement as to the covered vehicles. The first is "Amendatory Endorsement" form CW 00 01 04 96, dated April 1996 in the declarations page, and the second is "Amendatory Endorsement of Policy ProvisionsLouisiana" form PP 01 95 09 98, dated September 1998.
Under the "Amendatory Endorsement" form CW 00 01 04 96, Illinois National's obligations to Mr. Jenkins in the "Insuring Agreement" of Part A, "Liability Coverage," were amended to read as follows:
We will pay damages, other than punitive or exemplary, for "bodily injury" or "property damage" for which any "insured" becomes legally responsible because of an auto accident. Damages include prejudgment interest awarded against the "insured". We will settle or defend, as we consider appropriate, any claim or suit asking for these damages. In addition to our limit of liability, we will pay all defense costs we incur. Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted. We have no duty to defend any suit or settle any claim for "bodily injury" or "property damage" not covered under this policy. (Our emphasis.)
If this provision were applicable, Illinois National's position would be well-taken. However, under the later "Amendatory Endorsement of Policy Provisions Louisiana" form PP 01 95 09 98, Paragraph *27 A is replaced with the following language:
We will pay damages for "bodily injury" or "property damage" for which any "insured" becomes legally responsible because of an auto accident. We will settle or defend, as we consider appropriate, any claim or suit asking for these damages. In addition to our limit of liability, we will pay all defense costs we incur. Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted. We have no duty to defend any suit or settle any claim for "bodily injury" or "property damage" not covered under this policy. (Our emphasis.)
The most significant difference in the above two versions is the absence of the exclusionary clause relating to punitive or exemplary damages in the latter. Since both versions cannot apply, the policy must be interpreted to reconcile the issue of which version controls.
A policy of insurance is a contract, and must be interpreted according to the general rules of contractual interpretation. Magnon v. Collins, 98-2822, p. 6 (La.7/7/99), 739 So.2d 191, 196. Interpretation of a contract is the determination of the common intent of the parties. La. C.C. art.2045. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art.2050. Additionally, we are guided by the well-recognized rule that an exclusionary clause in an insurance policy must be strictly construed. Calogero v. Safeway Insurance Company, 99-1625, p. 6 (La.1/19/00), 753 So.2d 170, 173.
Where there is conflict between policy endorsements affecting the same coverage provision, the most recent endorsement form's language should be construed as superseding the corresponding language of the earlier endorsement. See Farr v. Pacific Mutual Life Insurance Company, 197 La. 111, 119, 200 So. 865, 867 (1941). Additionally, as the most recent endorsement form here is by its own terms specifically applicable to Louisiana, it should likewise be construed as controlling over the prior "general," non-territorial form, in the event of conflicting language. See, e.g., Corbello v. Iowa Production, 01-567, p. 9 (La.App. 3rd Cir.12/26/01), 806 So.2d 32, 41; Richard v. Borden, Inc., 597 So.2d 60, 65 (La.App. 1st Cir.1992).[5]
The policy clearly and unambiguously provides protection for damages for bodily injury, including both compensatory and exemplary damages.[6] As the insurer issuing the policy at issue, Illinois National is charged with knowledge of its contents. It predicated its handling of the claim, negotiations, and interpretation of its duty to defend upon the supposed existence of *28 exclusionary language which was not present in its policy.[7] From the standpoint of its insured, the result is the same as if the Impolicy terms were intentionally misrepresented. An insurer misconstruing the clear language of its own policy does so at its peril.
Illinois National's claims activity log documents the fact that it was aware that both involved vehicles were total losses by January 27, 2000. By April 14, 2000, it had received the medical reports relating to Ms. Lafauci's treatment up to that time. By April 20, 2000, it was in possession of documented medical expense records totalling $2,004.76. An adjuster spoke with Ms. Lafauci and noted that the collision involved a "hard impact" which totalled her automobile, and that she sustained a fracture of the right patella, a right ankle contusion, and a left hand contusion.
By letter dated June 6, 2000, Illinois National made a "firm offer" of settlement in the total amount of $5,000.00. By letter dated June 9, 2000, Ms. Lafauci's counsel provided documentation of total medical expenses of $2,666.90, and conveyed a settlement offer for the policy limits. On July 10, 2000, Illinois National responded in writing with a counteroffer of $5,500.00 total. By letter of the same date, Ms. Lafauci's counsel reiterated the policy limits demand, and advised that if it were not accepted suit would be filed. Suit was filed on September 25, 2000.
By letter dated October 9, 2000, Ms. Lafauci's prior offer to settle for the policy limits was withdrawn. Shortly after suit was filed, Illinois National offered its policy limits "in full and final settlement" on its behalf and that of its insured. Ms. Lafauci rejected that offer and countered with an offer of $15,000.00. There is no evidence that her offer to settle for the liability limits nor the subsequent offer of $15,000.00, made after suit was filed, was ever timely communicated to Mr. Jenkins. He was not notified of his potential exposure to an excess judgment until after March 7, 2001, almost eight months later.
A liability insurer is the representative of the interests of its insured, and when handling a claim against its insured must carefully consider not only its own self-interest, but also its insured's interest, to protect the insured from exposure to excess liability. Smith v. Audubon Insurance Company, 95-2057, pp. 7-8 (La.9/5/96), 679 So.2d 372, 376. In fulfilling its role as the champion of its insured's interests, a liability insurer owes its insured the duty to act in good faith and to deal fairly in handling claims. Id. In Smith, our Supreme Court articulated the following principles in determining whether a liability insurer has complied with that duty:
[T]he determination of whether the insurer acted in good faith turns on the facts and circumstances of each case. Of course, an insurer is not obligated to compromise litigation just because the claimant offered to settle a claim for serious injuries within the policy limits, and its failure to do so is not by itself proof of bad faith. The determination of good or bad faith in an insurer's deciding to proceed to trial involves the weighing of such factors, among others, as the probability of the insured's liability, the extent of the damages incurred by the claimant, the amount of the policy *29 limits, the adequacy of the insurer's investigation, and the openness of communications between the insurer and the insured....
Because the determination of a liability insurer's bad faith failure to settle in excess judgment cases is so fact-intensive, great deference must be accorded to the trier of fact....
Id., 95-2057 at pp. 9-10, 679 So.2d at 377.
Even if a liability insurer is not in bad faith in its evaluation of a claim or in refusing to settle a claim, it may still be found to be in bad faith for failure to keep its insured informed of the status of settlement negotiations and other developments affecting his excess exposure. The failure to do so may expose it to liability to its insured for all or part of any excess judgment, as well as his attorney's fees incurred in protecting himself and in prosecuting his claim for consequential damages against his insurer. See Maryland Casualty Company v. Dixie Insurance Company, 622 So.2d 698, 702-03 (La.App. 1st Cir.1993).
As of October 24, 2000, the date the suit was assigned to its defense counsel, Illinois National's handling adjuster had decided upon its course of action in the event its offer of the policy limits was rejected. The claims activity log for that date reveals that in that event, its counsel would be instructed to answer the suit only for Illinois National, and it would deposit the funds "into the court to stop the interest" and to "conclude our obligation under the policy." Its motion to deposit its policy limits into the registry of the court was not filed until February 28, 2001, over three months after it had filed its answer and three weeks after Mr. Jenkins filed his answer and cross-claim. There is no evidence that Illinois National ever provided or offered to provide a defense to Mr. Jenkins during the period of over four months between the filing of suit and the time his answer was filed by his own attorney.
Illinois National's reliance on the case of Pareti v. Sentry Indemnity Company, 536 So.2d 417 (La.1988), is misplaced. In Pareti, the Louisiana Supreme Court found that a clause providing that the "duty to settle or defend ends when [the] limit of liability is exhausted," identical to that involved here, was unambiguous and enforceable, absent bad faith. However, the court emphasized that "[a]n insurer which hastily enters a questionable settlement simply to avoid further defense obligations under the policy clearly is not acting in good faith and may be held liable for damages caused to its insured." Id. at 423. Even where a settlement or other payment of the policy limits is made in good faith, "... the insurer must make every effort to avoid prejudicing the insured by the time of its withdrawal from the litigation." Id. at 423. In this case, even if Illinois National's duty to defend Mr. Jenkins ended upon the deposit of its limits in the court registry, it nevertheless had the fiduciary duties to keep him informed, to protect his interests, and to defend him in the litigation up to the time of the deposit.
Illinois National argues that the trial court erred in rendering judgment against it on the cross-claim, since it did not commit any of the specific acts enumerated in La. R.S. 22:1220(B). The trial court below did not specifically base its award in favor of Mr. Jenkins and against Illinois National on a finding that Illinois National violated the provisions of La. R.S. 22:1220. Although the trial court awarded Mr. Jenkins indemnity for the entirety of the excess judgment rendered against him, reasonable attorney's fees, and costs, it did not award the statutory penalties recoverable under La. R.S. 22:1220(C). From a practical standpoint, such a finding would *30 not change the result reached herein. Mr. Jenkins did not appeal the trial court's judgment or answer Illinois National's appeal as to its failure to award statutory penalties. The recovery granted him is authorized under the law and jurisprudence regulating the duties of a liability insurer to its insured, previously discussed, which the statute merely supplements and complements.

THE EFFECT OF THE TENDER AND DEPOSIT
Mr. Jenkins raises this the issue: Did the "tender" made by Illinois National by depositing its limits into the registry of the trial court relieve it from any further duty to defend its insured? The policy, as amended, provided that its "duty to settle or defend ends when [its] limit of liability for this coverage has been exhausted." Mr. Jenkins contends that the tender was insufficient, since the policy limits were not paid to Ms. Lafauci directly, and she was required to litigate her entitlement to the funds deposited in the registry of the court. We agree that the tender and deposit were insufficient, but for somewhat different reasons.
Although we acknowledge the common practice of insurers depositing money into the registry of the courts when liability is admitted, the only statutory authorities for the practice under these facts are La. C.C. arts. 1869 and 1871.[8] Those articles provide as follows:
La. C.C. art. 1869
When the object of the performance is the delivery of a thing or a sum of money and the obligee, without justification, fails to accept the performance tendered by the obligor, the tender, followed by deposit to the order of the court, produces all the effects of a performance from the time the tender was made if declared valid by the court.
A valid tender is an offer to perform according to the nature of the obligation.
La. C.C. art. 1871
After the tender has been refused, the obligor may deposit the thing or the sum of money to the order of the court in a place designated by the court for that purpose, and may demand judgment declaring the performance valid.
If the deposit is accepted by the obligee, or if the court declares the performance valid, all expenses of the deposit must be borne by the obligee.[9]
*31 We conclude that Illinois National did not make a proper tender and deposit under La. C.C. arts. 1869 and 1871, as its offer of settlement for the limits, conditioned on the "full and final" release of its insured and itself, and without inclusion of the legal interest and costs owed under the policy, did not constitute a proper "tender." That offer, made prior to the deposit, was conditional; it was predicated upon the compromise of Ms. Lafauci's claims against Mr. Jenkins in excess of the policy limits, and required further action on her part, the execution of a written release of those claims.[10] Even after the deposit of the limits and accrued interest was made, Ms. Lafauci was required to seek a further court order permitting her to withdraw the deposited funds.[11] Additionally, Illinois did not offer the incurred court costs, nor did it deposit those costs incurred by Ms. Lafauci as of the date of deposit.[12] Under these facts, there was no valid tender and no valid deposit. Since there was no valid tender and deposit, the liability limits were not "exhausted" by payment.[13] Therefore, the insurer's duty to defend its insured did not end.
We hold that where a liability insurer seeks to terminate its duty to defend its insured, in addition to the accrual of legal interest and costs, by making a tender and/or deposit, it must strictly comply with the procedural rules governing tender and deposit, and must do so in good faith. The insurer here did neither. Even if its attempted tender would have been sufficient to terminate its duty to defend its insured under the rationale of Pareti v. Sentry Indemnity Company, 536 So.2d 417 (La.1988), the tender was made after its duties of adjusting the claim fairly, properly keeping its insured informed, making a reasonable effort to settle the claim, and properly defending its insured had already been breached. Accordingly, the result reached herein would be the same.
Given the foregoing analysis, we conclude that the trial court's judgment against Illinois National on the cross-claim of Mr. Jenkins, based upon the implicit finding of bad faith on its part, is correct, and we affirm its judgment, as amended below. We further affirm the supplemental judgment of April 24, 2002, awarding attorney's fees and costs.

*32 CONCLUSION
We reverse the judgment of the trial court as to the award of $10,000.00 in general damages for psychological injuries to the plaintiff, Monica Ann Lafauci, and award her the sum of $2,500.00 in general damages for the psychological injury of simple phobia. Accordingly, the trial court's original judgment on the principal demand after trial is modified to reduce the total monetary award to the sum of SIXTY-THREE THOUSAND ONE HUNDRED EIGHTY-SIX AND 90/100 DOLLARS ($63,186.90), together with legal interest thereon from date of judicial demand, and all costs of these proceedings.
The trial court's judgment on the principal demand is affirmed in all other respects.
Because Illinois National's tender and deposit was ineffective, the judgment of the trial court on the cross-claim is amended to increase the monetary award in favor of the cross-claimant, Randall J. Jenkins, and against the defendant in cross-claim, Illinois National Insurance Company, to the sum of SIXTY-THREE THOUSAND ONE HUNDRED EIGHTY-SIX AND 90/100 DOLLARS ($63,186.90), together with legal interest thereon from date of the plaintiff's judicial demand until paid and for all costs of these proceedings, representing the total amount of the judgment rendered against the defendant, Mr. Jenkins.
The trial court's judgment on the cross-claim, as supplemented by the judgment of April 24, 2002, is affirmed in all other respects.
Finally, because the trial court's judgment did not dispose of Ms. Lafauci's cause of action against Illinois National, and there is no other indication in the record of its disposition, it is amended by adding the following:
"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the cause of action of the plaintiff, Monica Ann Lafauci, against the defendant, Illinois National Insurance Company, be and is hereby dismissed with prejudice."
All costs of this appeal are assessed to the defendant in cross-claim/appellant, Illinois National Insurance Company.
AFFIRMED IN PART, AMENDED, AND REVERSED IN PART.
KUHN, J., concurs.
NOTES
[1] No credit against the principal or interest of the damages award was made in favor of Mr. Jenkins by virtue of the prior deposit by Illinois National.
[2] As a party aggrieved by the judgment in favor of Ms. Lafauci, Illinois National may properly appeal that judgment, even though it was not directly cast in judgment on her cause of action, but only on the cross-claim of its insured, Mr. Jenkins. Emmons v. Agricultural Insurance Company, 245 La. 411, 425, 158 So.2d 594, 599-600 (1963). Illinois National has appealed from both the original partial judgment of September 18, 2001, and the judgment on Mr. Jenkins's Motion to Tax Fees and Costs, signed on April 24, 2002, which supplemented the original judgment.
[3] Plaintiff requested written findings of fact and reasons for judgment on September 20, 2001. The trial never complied with that request, as required by La. C.C.P. art. 1917. As plaintiff never sought supervisory writs nor moved to remand the case for rendition of written reasons for judgment, such failure does not prevent our consideration of this appeal. Brocato v. Brocato, 369 So.2d 1083, 1085 (La.App. 1st Cir.1979).
[4] Shortly after describing the hearsay statement, to which objection was not made, plaintiff acknowledged that Ms. Case's report showed a diagnosis of only "simple phobia." In addition to the unsupported hearsay statement, the trial court may have based its finding of a post-traumatic stress disorder on the allegation in plaintiff's petition that she sustained "post traumatic stress and other related anxiety." Controverted pleadings are not evidence. Department of Health and Hospitals v. Teachers' Retirement System of Louisiana, 95-1074, p. 4 (La.App. 1st Cir.12/15/95), 665 So.2d 748, 750.
[5] Part F, "General Provisions", of the policy at issue indirectly supports this reasoning. Under the section entitled "Changes," Paragraph A provides that the policy's "terms may not be changed or waived except by endorsement issued by us." (Our emphasis.) Paragraph C further states:

If we make a change which broadens coverage under this edition of your policy without additional premium charge, that change will automatically apply to your policy as of the date we implement the change in your state. This paragraph (C) does not apply to changes implemented with a general program revision that includes both broadenings and restrictions in coverage, whether that general program revision is implemented, through introduction of:
1. A subsequent edition of your policy; or
2. An Amendatory Endorsement.
(Our emphasis.)
[6] See Bauer v. White, 532 So.2d 506, 508 (La.App. 1st Cir.1988).
[7] Illinois National's claims activity log evidences that on October 20, 2000, an adjuster noted that there was a "punitive damage allegation" in the petition, but that the policy included the "CW0001 endorsement." He recommended that the insured be put "on notice." There was no recognition nor mention of the later endorsement, although it was listed on the second page of the policy declarations.
[8] La. C.C.P. art. 4658 applies only in the context of a concursus proceeding, and is inapplicable here.
[9] Professor Litvinoff elucidates the guiding principles for a valid tender and deposit under these articles:

[W]hen the object of performance is a sum of money, a check for the right amount sent by the obligor is a tender, and if that check is returned uncashed by the obligee, the obligor may proceed to take the next step. As once expressed by a Louisiana court, in order to be validly tendered, a sum of money must be placed in the power of the adverse party.
If he so wishes, however, an obligor may omit an extra-judicial tender and proceed to make a tender together with a deposit of the object of the performance in an action filed for that purpose, as Louisiana Courts have asserted that a separate act of tender need not precede the deposit. 5 Saúl Litvinoff, Louisiana Civil Law Treatise: The Law of Obligations § 15.11 (2nd ed. 2001)....
The amount tendered must be the full amount owed, which, in the case of a money-debt, includes principal, interest, and expenses chargeable to the obligor....
Last, but certainly not least, a valid tender must be unconditional. Thus, when the object of the performance is a sum of money, it must be placed in the power of the obligee, that is, the obligor's intention must be that the creditor is at liberty to take the tendered object. If the availability of the object is made to depend on further orders by the court, the tender is then conditional and fails to produce liberative effects.
Id. § 15.13.
[I]n a suit for damages arising from an accident, the defendant-insurer may deposit funds sufficient to cover the policy limits, court costs, and interest to date, for the purpose of preventing the further accrual of interest....
It should be clear that the court will need to decide on the validity of the tender and deposit of the object of the performance if the creditor contests that validity, which he will no doubt do if the deposit does not conform to the requirements already discussed.
Id. § 15.24.
[10] La. C.C. art. 3071.
[11] The order permitting the deposit could have also provided that the funds deposited were payable to Ms. Lafauci on demand, without the need for further action on her part or that of the trial court.
[12] The policy provides that "[I]n addition to our limit of liability, we [Illinois National] will pay all defense costs we incur." Those "costs" are not further defined. We construe the insurer's obligation in that regard as including court costs assessed against its insured, incurred prior to the exhaustion of the policy limits. Additionally, as in this case, those costs include court costs taxed pursuant to La. C.C.P. arts. 1920 and 2164.
[13] "A tender is valid when it meets the same requirements as a valid payment." 5 Saúl Litvinoff, Louisiana Civil Law Treatise: The Law of Obligations § 15.13 (2nd ed.2001).