Judgment rendered January 21, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,594-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

GIBSLAND BANK AND TRUST                    Plaintiff-Appellee
COMPANY

versus

THE SECURITY TITLE                         Defendant-Appellant
GUARANTEE CORPORATION
OF BALTIMORE

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 606,872

Honorable Ramon Lafitte, Judge

* * * * *

HARLAN LAW FIRM, LC                        Counsel for Appellant
By: Hansel M. Harlan

PERKINS AND ASSOCIATES, LLC
By: Mark A. Perkins
    John F. Frederickson

COLVIN, SMITH, McKAY & BAYS                Counsel for Appellee
By: James H. Colvin, Jr.
    J. Clayton Caraway

* * * * *

Before PITMAN, STONE, and ELLENDER, JJ.

**ELLENDER, J.**

Security Title Guarantee Corp. of Baltimore ("Security") appeals a judgment finding it breached its title insurance policy to Gibsland Bank & Trust ("GBT") and that its failure to pay was arbitrary and capricious, resulting in property tax penalties and interest of $33,256.71, attorney fees from the borrower's bankruptcy and sheriff sale of $13,113.12, a statutory penalty of $5,632.76, and attorney fees of $140,174.78. GBT answers the appeal seeking additional damages of $258,500 and an enhanced penalty of $92,739.66. For the reasons expressed, we find the district court erred in awarding certain damages that were not covered by Security's policy and in imposing excessive attorney fees. We therefore reverse in part, affirm in part, and render to reflect these changes. We also deny GBT's answer to appeal.

**FACTUAL BACKGROUND**

The borrower, Timothy Thomas, owned property in Avery Subdivision, in central Shreveport (4710 Linwood Ave.). In late 2010 he came to GBT to get a loan for his construction business and tree service, offering the property as security. GBT agreed to extend him a $150,000 secured line of credit and hired John Settle, of ArkLaTex Title, to conduct a title exam.[1] The preliminary exam, dated January 5, 2011, revealed one prior lien, a 2008 mortgage held by Bankers' Insurance Co. ("BIC"), which was to be canceled at closing. On January 13, 2011, the loan was closed, GBT advanced Thomas $50,634.07, and had him sign a multiple obligations

---

[1] Settle was a practicing attorney who also owned the title company at the time. He sold the title company in 2019 and permanently resigned from the practice of law in lieu of discipline in early 2020. *In re Settle*, 19-1838 (La. 1/14/20), 268 So. 3d 1038.

mortgage ("MOM") for $154,009. GBT purchased a title insurance policy issued by Security, as principal, from ArkLaTex Title, as agent, for $154,009, dated January 13, 2011. The policy insured GBT's MOM would be in a first lien position.

The MOM was not recorded until January 19, 2011, six days after the closing. However, on January 11 – after the date Settle completed his preliminary title exam on January 5 but before GBT's MOM was recorded – Thomas executed another mortgage on the property in favor of BIC, for $100,000 and payable to any future holder. BIC recorded this the same day, January 11. The preliminary title exam was not updated prior to issuing the title policy on January 13, or prior to GBT's MOM being filed on January 19, to confirm no new liens were now encumbering the property. Settle issued the title insurance policy on behalf of Security on January 13 showing GBT in a first lien position. However, because BIC's mortgage was filed eight days before GBT's MOM, BIC was actually in a first lien position, relegating GBT to second.

On May 18, 2011, the Caddo Parish Clerk of Court generated a mortgage certificate showing BIC's 2011 mortgage was superior to GBT's MOM. However, GBT did not scan this into its system until almost a year later, May 8, 2012. GBT's internal auditor, Scott Spillers, testified he had no idea when GBT received the certificate, and he never saw it until it was scanned.

In the meantime, however, on February 4, 2012 – before the certificate was scanned – GBT advanced another $140,569 to Thomas, still secured by the MOM. Then, on April 26, GBT obtained from Security an increase in its policy limits, from $154,009 to $500,000. Again, on May 3,

2

GBT advanced yet another tranche, $292,000, to Thomas, secured by the MOM.

On May 8 – the day the mortgage certificate was scanned – Wade Holloway, the GBT officer who handled Thomas's loan, emailed John Settle to say there was "some confusion" about the BIC mortgage, which predated the MOM. Holloway wrote GBT needed to advance still more money to Thomas, but they were "at a standstill" until the matter could be clarified. Notably, GBT did not notify Security about the problem, only Settle. For the next several years, Settle tried to negotiate with Thomas to subordinate the BIC mortgage to the MOM; these efforts were unsuccessful.

Nevertheless, on June 4, 2013, GBT advanced yet another large sum of money, $197,500, to Thomas, again secured by the MOM. GBT's president, Tom Martin, testified that for several years Thomas was current on his payments. Unbeknownst to GBT, however, Thomas had let his property taxes lapse for the years 2012 through 2016; because GBT was not the first-position lender, it did not receive notice of this delinquency. In early 2017, Thomas defaulted on his GBT loans.

On March 22, 2017, GBT's in-house counsel, Jack Slaid, advised Security by certified mail that the policy insured a merchantable title, the BIC mortgage was in fact in first position, and the payoff on the MOM was $475,325. The letter demanded that Security "resolve the claim" under the policy. This was the first notice sent directly to Security at the address provided in the policy for such notices.

On March 28, Security responded to GBT, acknowledging the claim and stating the company was investigating the matter. That same day,

Security emailed John Settle referring to a "notice of claim" and asking Settle to forward his file; Settle promptly sent Security the closing file.

On April 4, Security sent GBT a follow-up letter advising its investigation disclosed GBT had knowledge of the BIC mortgage at least by April 2012. Security asked why notice of the prior mortgage was not given then, as required by the policy. Security also emailed a series of follow-up questions to Settle, who denied recalling much about the transaction. In later emails between Settle and GBT's president, Martin, Settle stated, "It's always a former employee who drops the ball," and advised that his agency relationship with Security had been terminated.

On July 5, GBT's in-house counsel responded to Security, "I am at a loss as to why our knowledge or lack thereof would be relevant." Slaid further said he would gather the requested materials, but he reiterated GBT's claim on the policy.[2] According to Security, no further documents were ever provided.

## PROCEDURAL HISTORY

On February 21, 2018, GBT filed this suit against Security. It alleged the policy was triggered by the notice it sent on March 22, 2017, and acknowledged on March 28, but Security took no further action within the 60 days allowed by La. R.S. 22:1973 for resolution of the claim. It also claimed this conduct was in bad faith, arbitrary, capricious, and without probable cause, thus activating penalties and attorney fees under R.S. 22:1973 and 22:1892.

---

[2] The record shows Thomas declared bankruptcy twice, in August 2017 and in March 2018, placing him temporarily out of reach of litigation.

4

Roughly three weeks later, on March 15, 2018, Security cured the priority issue by issuing a check for $11,247.58 to pay off the BIC mortgage. This action placed GBT in the first position, but, unfortunately, it did not end the litigation.

Security immediately asserted that GBT failed to mitigate its damages, had prior knowledge of the BIC mortgage but failed to disclose this timely, and the policy did not cover the kind of damages being claimed.

In February 2019, GBT moved for partial summary judgment on the issue of coverage. The district court granted this motion, but Security took a writ and, in late August, this court reversed the summary judgment. The Supreme Court denied writs, essentially confirming the existence of a genuine issue of material fact regarding coverage. *Gibsland Bank & Tr. Co. v. Security Title Ins. Co. of Maryland*, 19-01551 (La. 11/25/19), 283 So. 3d 498.

Security then moved for its own summary judgment. The matter was docketed for May 2021, but the record does not show a ruling. Thereafter, GBT filed a motion to quash the deposition of John Settle; the district court allowed the deposition to proceed but limited it to one hour. Security then filed a peremptory exception of peremption, urging any action against Settle was perempted by the five-year period of R.S. 9:5631. The parties took seven depositions, including Settle's, and filed multiple briefs. The district court denied the exception of peremption in August 2022.

**TRIAL TESTIMONY**

After more comprehensive briefing, the matter finally came to trial over two full days in July 2023.

5

GBT's president, Tom Martin, testified as outlined above. He admitted learning in May 2012 that GBT was not in the first position. Even though the mortgage certificate was dated May 2011, it was not scanned by GBT until May 2012, and he did not know about it until then.[3] He also confirmed GBT hired Settle to perform the title exam. Martin added that in 2012, the property had been appraised at $701,000 and, in 2019, at $658,500; however, when it finally sold at sheriff sale, in March 2022, it brought only $400,000. Martin felt Security's failure to settle quickly had cost GBT the difference, $258,500. He also felt Security's conduct had required GBT to participate in Thomas's bankruptcy proceedings and to delay the foreclosure, costing attorney fees of $13,113.12. Martin requested all these amounts in damages.

John Settle also testified as outlined above. He admitted his office "dropped the ball" in that between January 5, 2011, when he wrote the preliminary title opinion, January 13, when the policy was issued, and January 19, when the MOM was finally filed, he failed to perform any "follow-up" title work to ensure there were no newly filed liens encumbering the property. "Proper procedures weren't followed," he conceded.

Security's vice-president of underwriting, John Kosogof, testified the policy spoke for itself but, as an attorney, he felt it implicitly obligated the insured to notify the company as soon as it discovered any problem. He also insisted Settle was never an employee of Security's; rather, Settle's company, ArkLaTex Title, was an agent.

---

[3] The loan officer who had set up the MOM, Bill Collins, testified by deposition to the same effect.

GBT's in-house counsel, Jack Slaid, acknowledged the letters he received from Security but opined it made no difference that GBT might have known about the BIC mortgage back in 2011 or 2012.

A loan officer, Mike Holloway, testified that another loan officer, Bill Collins, had negotiated the MOM and disbursed the initial funds to Thomas. Holloway took over the account in April 2012 and, at that time, he had no idea the MOM was not in the first position.

GBT's internal auditor, Spillers, testified as noted above; he did not know why the mortgage certificate was not scanned until May 2012.

Finally, Thomas took the stand, generally confirming the timeline of the documents in evidence. He was certain that various people at GBT knew about the BIC mortgage, which he described as "not, like, a real mortgage," but only security for his separate business, as a bail bondsman. He also admitted that Settle had offered him $500 to subordinate the BIC mortgage to GBT, but he declined, because he still needed his bail bond license.

## ACTION OF THE TRIAL COURT

After taking the case under advisement, the district court gave oral reasons for judgment in November 2023. The court noted GBT's assertions that Security's failure to adjust the claim resulted in (1) being forced to file this suit, (2) sustaining damages in property tax penalties, interest, attorney fees, and lost value of collateral, and (3) Security knew about the title defect as early as 2012 because GBT advised Settle about it at that time, and Settle was Security's agent. Without further elaboration, the court found Security's failure to pay the claim in a reasonably diligent manner was "in fact arbitrary and without probable cause which * * * caused some damage" to GBT. The court found the damages included the itemized property tax

penalty and interest of $33,256.71 and attorney fees from the bankruptcy case and sheriff sale of $13,113.12. The court also imposed a statutory penalty of $5,632.76.

The court further found, however, "no evidence, sufficient evidence I should say," to support GBT's claim for diminished value of the property, so it rejected this item of damage. The court directed GBT to prepare a judgment for the total award, $52,002.59.

## SUBSEQUENT PROCEEDINGS

Shortly after the oral ruling, GBT moved to set and quantify attorney fees and costs. GBT ultimately submitted an invoice for 680.6 hours at $200 an hour plus costs, for a total of $140,174.78.

Both sides filed motions to quash and engaged competing experts. GBT hired a local attorney, Todd Benson, who said the hours and rate were eminently reasonable; he felt Security "threw the kitchen sink" at GBT and needlessly dragged the litigation over six years. Security hired a Loyola Law School professor and legal-ethics author, Dane Ciolino, who agreed the hourly rate was reasonable but then identified (1) 9 items that were "block billed," which is "not standard practice"; (2) 15 items that were "potentially duplicative"; (3) one instance when GBT's lawyer billed 13.08 hours in a single day; and (4) most items were "inadequately described" to support the billing. However, Prof. Ciolino did not say what a reasonable fee would have been.

At the hearing, in April 2024, GBT tendered Benson as an expert in "reasonableness of attorney fees in commercial litigation"; over Security's objection, the district court accepted him, and he testified in accordance with his report. Security did not bring Prof. Ciolino to court but offered his

8

deposition; GBT objected, and the court refused to admit it. The document was proffered only.

In August 2024, the court ruled orally, summarizing all the claimed damages. It accepted Benson's assessment of attorney fees, with the observation, "There was a lot of time spent by both sides in this matter." The court awarded the full claimed amount, $140,174.78. It also awarded Benson's expert witness fee, $9,887.65.

A comprehensive judgment was signed August 7, 2024. Security appealed suspensively, raising four assignments of error. GBT answered the appeal, raising two assignments.

## DISCUSSION

### *Breach of Contract*

By its first assignment of error, Security urges the court erred in finding it breached the policy. Security shows the policy is the law between the parties, *Peterson v. Schimek*, 98-1712 (La. 3/2/99), 729 So. 2d 1024, and cites Condition 3 (notice of claim) and Condition 6(a) (duty to cooperate) as the applicable provisions.[4] Security argues that after April 4, 2017, when it

---

[4] Condition 3 states as follows: "NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT. The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured of any claim of title or interest that is adverse to the Title or the lien of the Insured Mortgage, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title or the lien of the insured Mortgage, as insured, is rejected as Unmarketable Title. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under this policy shall be reduced to the extent of the prejudice."

Condition 6(a) states, in pertinent part: "DUTY OF INSURED CLAIMANT TO COOPERATE. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting, or defending the action or proceeding, or affecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title, the lien of the Insured Mortgage, or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligation to the Insured under the policy shall terminate,

wrote to GBT's in-house counsel asking for more documents, GBT stopped responding, replying only that counsel thought the point raised by Security was irrelevant. Security suggests GBT could have provided (1) the 2011 mortgage certificate, showing BIC's first position, or (2) documents about GBT's further advances to Thomas. Security contends GBT's refusal to cooperate breached the contract.

GBT responds that the policy defined "covered risks" to include "10. The lack of priority of the lien of the Insured Mortgage upon the Title over any other lien or encumbrance." The existence of the BIC mortgage that had priority over the MOM, GBT argues, was a covered risk, which Security failed to pay, thus breaching the contract.

An insurance policy is a contract that constitutes the law between the parties and must be enforced as written. *Martinez v. Am. Transp. Group Risk Retention Group Inc.*, 23-01716 (La. 10/25/24), 395 So. 3d 731; *Bucklin v. Stewart*, 54,487 (La. App. 2 Cir. 9/28/22), 348 So. 3d 896. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050; *LeBlanc v. Aysenne*, 05-0297 (La. 1/19/06), 921 So. 2d 85.

At the outset, we note, with the district court, GBT's assertion that Security received notice of the claim by 2012, when Holloway emailed John Settle, president of ArkLaTax Title, Security's agent, advising of "some confusion" about the BIC mortgage. It is true that under the general rules of mandate, knowledge of an agent is imputed to the principal. La. C.C. art. 2989; *Samuels v. State Farm Mut. Auto Ins. Co.*, 06-0034 (La. 10/17/06),

_____

including any liability or obligation to defend, prosecute, or continue any litigation with regard to the matter or matters requiring such cooperation."

10

939 So. 2d 1235; *Smith v. Grantham*, 23-0881 (La. App. 1 Cir. 9/4/24), 394 So. 3d 316. The general rule, however, does not apply when both insurer and insured agree as to the correct terms and intent of the policy. *Samuels v. State Farm*, *supra*. The policy is the law between the parties. *Martinez v. Am. Transp. Group*, *supra*; *Bucklin v. Stewart*, *supra*. Security's policy, Condition 3, quoted above, required notice in writing, and Condition 17 stated, "Any notice of claim * * * must be given to the Company at Six South Calvert Street, Baltimore, Maryland 21202. Attn. Claims Department." Notice in compliance with these conditions was not sent until the demand letter, by certified mail and dated March 22, 2017. While Settle was given notice of a potential claim in May 2012, GBT's assertion this notice would somehow be sufficient, in spite of the clear language of the contract, is without merit.

On the substantive issue, however, the district court did not commit manifest error in finding Security breached its obligation to pay the covered risk of lack of priority of the MOM. Lack of priority is specifically defined as a covered risk, under Covered Risk No. 10. GBT's certified letter to Security dated March 22, 2017, clearly identified the BIC mortgage, by instrument number and mortgage book and page; John Settle's closing file, emailed to Security on March 29, 2017, explicitly acknowledged the existence of the BIC mortgage. On this showing, coverage attached. GBT's failure to send additional proof, such as the mortgage certificate and information about further advances to the borrower, did not alter the notice and coverage. The finding of a breach is affirmed.

### Elements of Damage

By its second assignment of error, Security urges the court erred in awarding two elements of damages for the breach: $33,256.71 for property tax penalties and interest, and $13,113.12 for attorney fees arising from Thomas's bankruptcy cases and the suit to quiet title. Regarding the first item, Security argues GBT failed to mitigate its losses, as required by La. C.C. art. 2002 and *1900 P'ship v. Bubber Inc.*, 27,475 (La. App. 2 Cir. 11/1/95), 662 So. 2d 808, *writ denied*, 96-0037 (La. 2/28/96), 668 So. 2d 369. Security concedes that, because GBT was not a first-position lienholder, it was not entitled to notice from the sheriff, under La. R.S. 47:2153, but argues GBT could have requested such notice, under R.S. 47:2159, and thus avoided the whole problem. In essence, GBT knew about the title problem as far back as at least 2012 but "sat back" for years allowing taxes and interest to accrue. Regarding the second item, Security argues attorney fees are never recoverable unless specifically provided by contract or statute, *State v. Wagner*, 10-0050 (La. 5/28/10), 38 So. 3d 240. It shows that this policy, Exclusion 3(d), excludes fees "subsequent to the date of the policy." Because the fees were incurred after the date of the policy, Security argues, they cannot be awarded.

GBT responds that mitigation is an affirmative defense, with the burden on the party asserting the defense, *MB Indus. LLC v. CNA Ins. Co.*, 11-0303 (La. 10/25/11), 74 So. 3d 1173, and submits that Security simply failed to meet this burden: Security is suggesting GBT could have used R.S. 47:2159 only now, on appeal, and the preponderance of the evidence shows that GBT acted prudently. GBT also suggests its attorney fees far exceeded the $13,113.12 awarded.

An obligee must make reasonable efforts to mitigate the damage caused by the obligor's failure to perform. When an obligee fails to make these efforts, the obligor may demand that the damages be accordingly reduced. La. C.C. art. 2002; *MB Indus. LLC v. CNA Ins. Co.*, *supra*; *Redstone v. Pipes*, 53,416 (La. App. 2 Cir. 4/22/20), 294 So. 3d 1113. The duty is what a "reasonably prudent man" would do in similar circumstances. *Redstone v. Pipes*, *supra*; *Byles v. Bank of Coushatta*, 50,120 (La. App. 2 Cir. 11/25/15), 184 So. 3d 789, *writ denied*, 16-0254 (La. 4/4/16), 190 So. 3d 1208.

On close examination, we are constrained to find GBT failed to make reasonable efforts to mitigate its losses upon receiving actual knowledge that its MOM was not primary. A reasonable bank would have realized much sooner that it misplaced or did not receive the May 2011 mortgage certificate, and then acted to rectify the matter; instead, it waited almost an entire year before entering the certificate in its system. A reasonable bank should have known providing notice to Settle and Ark-La-Tex Title upon discovery of the title problem would not absolve the bank from its contractual obligation to provide formal notice directly to Security pursuant to the clear language of the policy. This court would observe that had GBT promptly and properly advised Security of the problem, even in 2012, all the costs arising from the tax sale and Thomas's bankruptcies would have been avoided. GBT waited over four years before providing formal notice to Security and, during this time, it continued to advance a significant amount of money to the borrower. Further, as noted by Security, GBT had the statutory means of requesting notice of tax sale on this heavily mortgaged property, and it easily could have ascertained the payoff amount on the BIC

13

mortgage without waiting for Security to act. In finding manifest error, this court must recognize that GBT is a bank and trust company, a highly regulated and sophisticated financial business, and it has an in-house attorney. GBT is not the "average consumer" with limited fiscal sense. A reasonable bank in GBT's position would not have done any of the acts described above. We find GBT did not mitigate its losses and, therefore, this element of damages, $33,256.71, will be reversed.

Louisiana courts have long held that attorney fees are not allowed except where authorized by statute or contract. *Stutts v. Melton*, 13-0557 (La. 10/15/13), 130 So. 3d 808; *Sher v. Lafayette Ins. Co.*, 07-2441 (La. 4/8/08), 988 So. 2d 186; *KCREW Invs. LLC v. Clark*, 55,092 (La. App. 2 Cir. 5/10/23), 362 So. 3d 1288. The courts have rejected efforts to reframe attorney fees as merely another item of special damages and thus recoverable. *Hoffman v. 21st Century N. Amer. Ins. Co.*, 14-2279 (La. 10/2/15), 209 So. 3d 702; *Ardent Servs. LLC v. G & V Invs. LLC*, 23-253 (La. App. 5 Cir. 2/28/24), 382 So. 3d 1080. As the policy is the law between the parties, the insurer has the same right as any individual to limit its liability and place reasonable conditions on its obligations. *Martinez v. Am. Transp. Group Risk Retention Group*, *supra*.

The Security policy, "Exclusions from Coverage," states the Company "will not pay loss or damages, costs, attorneys' fees, or expenses" that arise by reason of "[d]efects, liens, encumbrances, adverse claims, or other matters * * * attaching or created subsequent to the Date of Policy[.]" Exclusion 3(d).

Thomas's bankruptcies were filed in August 2017 and March 2018, and the sheriff's sale was in March 2022 – all events occurring subsequent to

14

the date of the policy, January 13, 2011. The attorney fees incurred in connection with these events are excluded from coverage by the plain language of Exclusion 3(d). We decline GBT's invitation to view its efforts to prevent the tax sales and its participation in the bankruptcy proceedings as merely other elements of damage resulting from the breach. They are, by definition, attorney fees and are excluded from coverage. This element of damages, $13,113.12, will also be reversed.

### *Imposition of Penalties*

By its third assignment of error, Security urges the court erred in finding Security was arbitrary and capricious in handling GBT's claim. It concedes the issue was regulated by La. R.S. 22:1892 and R.S. 22:1973, which authorize penalties when the insurer's failure to pay is arbitrary, capricious, or without probable cause.[5] Moreover, the insurer owes an affirmative duty to adjust claims fairly and promptly, *Jacobs v. GEICO Indem. Co.*, 52,372 (La. App. 2 Cir. 9/26/18), 256 So. 3d 449, and the manifest error standard of review applies, *Calogero v. Safeway Ins. CO. of La.*, 99-1625 (La. 1/19/00), 753 So. 3d 170. However, the phrase "arbitrary, capricious, or without probable cause" is synonymous with "vexatious" and means a refusal to pay that is unjustified and without a reasonable or probable cause or excuse. *Reed v. State Farm Mut. Auto Ins. Co.*, 03-0107 (La. 10/21/03), 857 So. 2d 1012; *Jacobs v. GEICO*, *supra*. Security argues its conduct was not vexatious: it promptly acknowledged the claim, reviewed all documents submitted, began an investigation, found various

---

[5] La. R.S. 22:1973 was repealed effective July 1, 2024, and its substance incorporated into R.S. 22:1892. 2024 La. Acts No. 3, § 1. The prior versions were in effect at the time of this claim. *Bridges v. Chubb Indem. Ins. Co.*, 24-593 (La. App. 5 Cir. 7/2/25), 420 So. 3d 71.

15

irregularities, and asked for further information; instead of cooperating, GBT sent nothing else, waited six months, and then filed suit.  Security submits that mere failure to resolve the claim within the statutory period does not equal arbitrary and capricious action; rather, its conduct was "entirely reasonable and firmly grounded on probable cause."

GBT responds that the court did not err in finding Security arbitrary and capricious; simply put, Security took over 60 days to resolve the claim, a plain violation of R.S. 22:1973, and this activated penalties and attorney fees.

Louisiana courts have long recognized that an insurer owes its insured a duty of good faith.  *Smith v. Citadel Ins. Co.*, 19-00052 (La. 10/22/19), 285 So. 3d 1062, and citations therein.  This duty includes the duty to deal fairly in handling claims.  *Id.*; *Smith v. Audubon Ins. Co.*, 95-2057 (La. 9/5/96), 679 So. 2d 372.  Whether a refusal to pay is arbitrary, capricious, or without probable cause depends on the facts known to the insurer at the time of its action.  *Reed v. State Farm*, *supra*; *Handy on Behalf of Armstead v. State Farm Mut. Auto Ins. Co.*, 52,905 (La. App. 2 Cir. 9/25/19), 280 So. 3d 881.  Because the question is essentially a factual issue, the trial court's finding should not be disturbed on appeal absent manifest error.  *Id*.

The determination and extent of Security's liability is regulated by Condition 8, which provides, in pertinent part:

> This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.
> (a) The extent of liability of the Company for loss or damage under this policy shall not exceed the least of
>   (i)    the Amount of Insurance,
>   (ii)   the Indebtedness,

16

        (iii)    the difference between the value of the Title as insured and the value of the Title subject to the risk insured by this policy[.]

At the time of this claim, La. R.S. 22:1973 provided as follows, in pertinent part:

> A. An insurer * * * owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
> B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed by Subsection A of this Section:
>     * * *
> (5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
>     * * *
> C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. * * *

La. R.S. 22:1892 provided that all insurers shall make a written offer to settle any property damage claim within 30 days after receipt of satisfactory proof of loss of that claim. R.S. 22:1892 (A)(4). It further provided, in pertinent part:

> B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor * * *, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, * * * as well as reasonable attorney fees and costs. * * *

This court has already traced the outline of the claim adjustment in this case: formal notice to Security on March 22, 2017, seeking a payoff of the entire MOM, $475,325; Security's response to GBT and query to John

Settle on March 28; Security's follow-up letter to GBT on April 4; GBT's final communication to Security, July 5. Clearly, Security failed to make a payment within 60 days, as required by the former R.S. 22:1973, or to make a written offer to settle within 30 days, as required by R.S. 22:1892. Security did not do so until March 15, 2018, after this suit was filed, at a cost of $11,247.58 to pay off the BIC mortgage. Although GBT demanded a full payoff of its MOM, the district court was entitled to find that, at the very least, Security could have tendered the minimal amount necessary to satisfy Condition 8, to pay off the superior mortgage, within the 30- or 60-day period prescribed by the statutes. This minimal amount was not in serious dispute, despite GBT's prior conduct that imprudently escalated its losses.

The former R.S. 22:1973 and 22:1892 are penal in nature and must be strictly construed. *Baack v. McIntosh*, 20-01054 (La. 6/30/21), 333 So. 3d 1206; *Handy v. State Farm Mut. Auto Ins. Co.*, *supra*. The phrases "arbitrary, capricious, or without probable cause" and "vexatious" mean unjustified, without reasonable or probable cause or excuse. *Reed v. State Farm*, *supra*; *Jacobs v. GEICO*, *supra*. Security obviously did not satisfy its minimal obligation under Condition 8 within the prescribed periods, and did so only after suit was filed. On these facts, the district court was not plainly wrong to find Security's conduct was arbitrary, capricious, or without probable cause. This assignment of error lacks merit.

### *Amount of Attorney Fee as Penalty*

By its fourth assignment of error, Security urges that, in the event a penalty was warranted under R.S. 22:1973 and 22:1892, the court erred in awarding excessive attorney fees of $140,174.78. Security first contends the court erred in accepting Benson as an expert. It concedes the court's great

18

discretion, *Manchack v. Willamette Indus. Inc.*, 621 So. 2d 649 (La. App. 2 Cir.), *writ denied*, 629 So. 2d 1170 (1993), the court's "gatekeeping" function, *Blair v. Coney*, 19-00795 (La. 4/3/20), 340 So. 3d 775, and the standards for qualifying an expert, La. C.E. art. 702, but argues Benson had no special training as to the reasonableness of attorney fees, he did not cite any reliable principles and methods, and he did not purport to follow any. Instead, Security urges, the court should have heeded the report of Prof. Ciolino, who questioned individual entries in GBT's attorneys' invoice, its "block billing," excessive time on discrete tasks, some apparently duplicative charges, and the fact that GBT recovered only about 15% of the amount it claimed. Security concludes that if Benson's testimony is excluded, there is no evidence to support the award, and it should be reversed.

GBT responds the trial court has great discretion in fixing attorney fees, *Knight v. Tucker*, 52,438 (La. App. 2 Cir. 1/16/19), 263 So. 3d 625, and did not abuse its discretion in accepting Benson's blanket approval of the invoice.

It is well settled that courts may inquire into the reasonableness of attorney fees as part of their inherent authority to regulate the practice of law, regardless of the language of the statutory authorization for an award of attorney fees or the method employed by the trial court in making an award of attorney fees. *Smith v. State*, 04-1317 (La. 3/11/05), 899 So. 2d 516; *Brightwell v. City of Shreveport*, 54,824 (La. App. 2 Cir. 2/8/23), 356 So. 3d 586. The court is also not bound by or limited to the precise amount actually charged by the attorney. *Taylor v. Prod. Servs. Inc. of Mississippi*, 600 So. 2d 63 (La. 1992); *Quinlan v. Sugar-Gold*, 53,348 (La. App. 2 Cir. 3/11/20),

19

293 So. 3d 722, *writ denied*, 20-00744 (La. 10/6/20), 302 So. 3d 536.

Factors to consider in assessing the reasonableness of a fee include (1) the ultimate result obtained, (2) the responsibility incurred, (3) the importance of the litigation, (4) the amount of money involved, (5) the extent and character of the work performed, (6) the legal knowledge, attainment, and skill of the attorneys, (7) the number of appearances involved, (8) the diligence and skill of counsel, and (10) the court's own knowledge. *Smith v. State*, *supra*.

Regarding the qualification of expert witnesses, La. C.E. art. 702 provides, in pertinent part:

> A. A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (2) The testimony is based on sufficient facts or data;
> (3) The testimony is the product of reliable principles and methods; and
> (4) The expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The qualification of an expert witness rests within the sound discretion of the district court, and the court's determination will not be disturbed absent manifest error. *Benjamin v. Zeichner*, 12-1763 (La. 4/5/13), 113 So. 3d 197; *Miller v. Rayville Mfg.*, 53,573 (La. App. 2 Cir. 11/18/20), 307 So. 3d 1138. The court should be guided by two primary concerns: (1) whether the witness plans to testify to actual technical knowledge, and (2) whether such knowledge will assist the trier of fact in understanding or determining a fact at issue. *Miller v. Rayville Mfg.*, *supra*.

Regarding Security's argument that Benson did not qualify, under Art. 702, as an expert in the reasonableness of attorney fees, we are required to

defer to the discretion of the district court. We would agree that this topic should be within the knowledge of any trial judge or practicing attorney, and Benson did not enunciate any "reliable principles" or explain how he relied on them. However, courts occasionally qualify experts in this field. *State v. Williamson*, 597 So. 2d 439 (La. 1992); *Kullman Firm v. Integrated Elec. Techs. Inc.*, 24-0138 (La. App. 4 Cir. 9/27/24), 401 So. 3d 855, *writ denied*, 24-01313 (La. 1/14/25), 398 So. 3d 1171. Notably, both Benson and Prof. Ciolino agreed that the hourly rate of $185 to $200 stated on the invoice was eminently reasonable. Benson is a well-respected attorney who has enjoyed a long and successful career in this community. On this record, the district court did not abuse its discretion in accepting Benson as an expert in the reasonableness of attorney fees.

However, we cannot say the same for the total amount of the award. Courts may always inquire into the reasonableness of an attorney fee and are not bound by the precise amount actually charged by the attorney. *Taylor v. Prod. Servs. Inc. of Mississippi*, *supra*; *Quinlan v. Sugar-Gold*, *supra*. As penalty statutes, the former R.S. 22:1973 and 22:1892 must be strictly construed. *Baack v. McIntosh*, *supra*. The core objective of the penalty statute is to discourage bad-faith conduct of the insurer toward its insured, *not to make the insured whole*. *Wegener v. Lafayette Ins. Co.*, 10-0810 (La. 3/15/11), 60 So. 3d 1220; *PVCA Inc. v. Pacific W. TD Fund LP*, 21-0753 (La. App. 4 Cir. 7/13/22), 366 So. 3d 243, *writ denied*, 22-01220 (La. 11/8/22), 362 So. 3d 423. The glaring feature of this claim is that GBT initially demanded a full payoff amount of $475,325, and Security was able to cure the priority issue by having to pay BIC only $11,247. This court has rejected GBT's additional demands for $13,113 in itemized attorney fees

21

and $33,256 for property tax penalties and interest. The amount Security ultimately paid to put GBT in a first lien position was a mere fraction of the amount they demanded, but the fee awarded, $140,174, was roughly *12 times* the amount paid to settle the priority issue. This is patently out of proportion to the ultimate result obtained and was an abuse of discretion.

We have carefully reviewed the evidence in light of the factors set out in *Smith v. State*, *supra*. The amount of money involved was significant, but it was inflated by GBT's failure to follow the notice provision of the policy and its imprudent decision to continue advancing money to the borrower after it knew about the title problem. The extent and character of the work was technical, requiring special ability. The diligence and skill of counsel was impressive, although we would agree with Benson's comment that Security "threw the kitchen sink" at GBT. We find, based on this record, a reasonable fee as a penalty is $40,000. The judgment will be amended accordingly.

### *Answer to Appeal*

By answer to appeal, GBT raises two assignments of error. It first contends the district court erred in not awarding $258,500 for lost value of the collateral: a 2019 appraisal valued the property at $658,500, but it ultimately sold at sheriff's sale in March 2022 for only $400,000. GBT contends the difference should have been awarded.

The district court rejected this claim, finding no "sufficient" evidence to support a claim for diminished value, and we perceive no manifest error. GBT provided notice of claim in March 2017, and Security satisfied its obligation by paying off the BIC mortgage in March 2018. Appraisals from

22

2019 and 2022 obviously had no bearing on the potential loss of value from 2017 to 2018. This assignment of error lacks merit.

By its second assignment, GBT urges the court should have assessed a penalty of $92,739.66, under the former La. R.S. 22:1973, instead of the lower penalty of $5,632.76, under R.S. 22:1982.[6] GBT contends the higher penalty would be appropriate because of Security's flagrant breach of duty.

As noted, the penalty statutes are penal in nature and must be strictly construed. *Baack v. McIntosh*, *supra*; *Handy v. State Farm*, *supra*. We perceive no abuse of the district court's discretion when it elected to impose the lower penalty of R.S. 22:1892 (B)(1) instead of the higher penalty of the former R.S. 22:1973 (C). This assignment of error lacks merit.

## CONCLUSION

For the reasons expressed, the judgment is reversed in part, affirmed in part, and rendered as follows:

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that judgment is rendered herein in favor of the plaintiff, Gibsland Bank & Trust Co., and against the defendant, Security Title Guarantee Corp. of Baltimore, finding that defendant was arbitrary, capricious, and without probable cause in the handling of plaintiff's claim under Insurance Policy C06-062054.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, under the former La. R.S. 22:1973 and La. R.S. 22:1892, the defendant, Security Title Guarantee Corp. of Baltimore, is ordered to pay the plaintiff a penalty of $5,632.76, an expert witness fee of $9,887.65, attorney fees of $40,000.00, and all costs of these proceedings. It is further ordered that Security Title is ordered to pay unto GBT judicial interest on the $5,632.76 from date of judicial demand, and judicial interest on the $40,000.00 from the date of rendition of this judgment, until paid.

Appellate costs are to be paid one-half by Gibsland Bank & Trust Co. and one-half by Security Title Guarantee Corp. of Baltimore.

---

[6] The penalty of R.S. 22:1892 (B)(1) was "fifty percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater[.]" The penalty of the former R.S. 22:1973 (C) was "an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater."

23

REVERSED IN PART, AFFIRMED IN PART, AND RENDERED.